UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


HISHAM NIJEM,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        No. 3:10-00221
                                       )        JUDGE HAYNES
                                       )
ALSCO, INC.,                           )
                                       )
        Defendant.                     )


# MEMORANDUM

Plaintiff, Hisham Nijem, filed this action under Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e et seq., ("Title VII") and the Tennessee Human Rights Act, Tenn. Code Ann. §§

4-21-101 et seq. ("THRA") against the Defendant, ALSCO, Inc., his former employer. Plaintiff

asserts claims for disparate treatment and hostile work environment based on national origin as well

as a Tennessee common law claim of outrageous conduct. Plaintiff alleges, in essence, that

Defendant discriminated against him based on his national origin by assigning him to jobs he did not

want; paying him less and providing him less valuable benefits than similarly situated employees

outside the protected class; terminating him; and allowing and failing to remedy his exposure to a

hostile work environment.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 12),

contending, in sum: (1) that Plaintiff cannot establish a prima facie showing of discrimination or

hostile work environment; (2) that Plaintiff cannot show that Defendant's conduct was so outrageous

so as to cause Plaintiff a serious mental injury; and (3) that Defendant did not engage in any conduct

that would entitle Plaintiff to punitive damages under Title VII.[1] In response (Docket Entry No. 31), Plaintiff asserts that he has submitted sufficient evidence in support of his claims of discrimination, hostile work environment and outrageous conduct.

For the reasons set forth below, the Court concludes that for his Title VII claims, Plaintiff has presented sufficient proof on his racially hostile work environment and his termination claims, but Plaintiff lacks such proof on his job assignments and the pay and benefits claims. For his state law claim, the Court concludes that Plaintiff's proof fails to establish that Defendant's conduct would support a judgment under Tennessee law for outrageous conduct or intentional infliction of emotional distress.

## I. REVIEW OF THE RECORD[2]

The Defendant supplies uniforms and linens to restaurant and health care industries. (Docket Entry No. 32, Plaintiff's Response to Defendant's Statement of Undisputed Facts, at ¶ 1). Plaintiff, who is Lebanese, worked as a Route Sales Representative ("RSR") and Account Sales Consultant ("ASC") at the Defendant's Nashville branch from October 2006 until his termination on May 29, 2009. Id. at ¶ 2. An RSR delivers clean linens to customers, returns soiled linens to the Defendant's

---

[1]Plaintiff's claim for punitive damages under the THRA was dismissed by the Court. See (Docket Entry No. 52).

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Because material factual disputes exist, this section does not constitute a findings of fact under Fed. R. Civ. P. 56(d).

branch, and orders linen for the customer's next delivery. Id. at ¶ 3. Plaintiff's pay as an RSR was established by Union wage scale. Id. at ¶ 5.

Under Defendant's Standard Operating Procedures ("SOP"), an ASC at a branch with less than $200,000 in weekly revenue, or in a medium cost of living market, is paid a base annual salary of $26,000, plus commissions. Id. at ¶ 25. Where a branch's weekly revenue exceeds $200,000 per week, or in markets with a higher cost of living, the ASC's base annual salary is $30,000, plus commissions. Id. In March 2007, Bobby Morgan asked Rikli to help him obtain a higher base salary. Id. at ¶ 26. Rikli obtained authority from Gary Foster, the regional manager at that time, to pay Morgan the higher base salary of $30,000. Id. Without the additional salary, Morgan would not have taken the position. Id.

Plaintiff's RSR position was subject to the seniority system with Defendant's "Master Agreement" with the Teamsters Union. Id. at ¶ 22. In March 2008, Lewana Jackson, another RSR, exercised her rights of seniority under the "Master Agreement" and bumped Plaintiff from his route to an "extra" RSR position. Id. at ¶ 23. In March 2008, Defendant's Nashville branch had three extra RSRs, but Defendant's service module only allowed the branch to have two RSRs. Id. at ¶ 24. After one employee was laid off, Plaintiff was one of the two remaining extra RSRs. Id.

In April 2008, Plaintiff was considered for the ASC position, but Dan Jones, the new regional manager, was less flexible about deviating from the company's SOP. Id. at ¶ 27. Additionally, between the time that Morgan took the ASC position in March 2007 and the time Plaintiff was considered for the ASC position in April 2008, the Nashville branch lost $70,000 in weekly revenues after Defendant sold its hospital linen business. Id. Defendant hired Plaintiff for the ASC position effective May 5, 2008, at a base salary of $26,000 plus commission. Id. at ¶ 32. Six months after

the Plaintiff took the ASC job, Casey Madden, who is not a member of a protected class, was hired as an ASC at Defendant's St. Louis branch at a base salary of $26,000, plus commissions. Id. at ¶ 33. Rikli described the move to ASC from RSR as a lateral move. (Docket Entry No. 14, Rikli Deposition at p. 60).

Plaintiff stated that he initially did not want the ASC position. Id., Plaintiff Deposition at pp. 80-81. Plaintiff stated that the RSR position paid better than the ASC position and that the ASC position was a lateral move, not a promotion. Id. at pp. 83, 146. According to Plaintiff, Rikli stated that as an ASC he would pay Plaintiff the same as Morgan, provide a van and that if the ASC position was unsatisfactory, Plaintiff could return as a driver. Id. Plaintiff sated that he accepted the position based upon these promises and that he was not coerced to accept the ASC position. Id. at pp. 88-89. Rikli, however, denies any promise to pay Plaintiff the same as Morgan and cited Jones's change of the policy, allowing employees to drive company vans to and from work. Id., Rikli Deposition at pp. 54, 61-64. Jones sent a memorandum that "you can't take the van home." Id., Plaintiff Deposition at pp. 151-52. Further, Rikli may have told Plaintiff that he could return to RSR, if Plaintiff requested a return, but explained that Plaintiff's return required an available RSR position because Rikli could not lay off an existing RSR with union seniority rights or create a new position for Plaintiff. Id., Rikli Deposition at pp. 83-84.

Plaintiff lost his union seniority after he left his job as an RSR in May 2008. (Docket Entry No. 32, at ¶¶ 29, 32). Under section 19.10 of the Master Agreement, loss of seniority rights results from, among other reasons, resignation from employment. (Docket Entry No. 16, Exhibit 1 at 7). Plaintiff's decision to leave the bargaining unit for the ASC position was the equivalent of voluntary resignation of the RSR position. (Docket Entry No. 16, Abshire Declaration, at ¶ 10). Neither Rikli

nor Abshire can override the union's seniority system under the collective bargaining agreement. (Docket Entry No. 32, at ¶ 30).

In March 2008, several employees joked in the driver's room at the Nashville branch and discussed a nickname for Plaintiff when Defendant's Service Manager, Jackie Abshire, suggested "Achmed." Id. at ¶ 6. According to Plaintiff, two supervisors, Bobby Morgan and Mike Haley, were present during these discussions. (Docket Entry No. 14, Plaintiff Deposition at pp. 106, 116). Plaintiff reported Abshire's comment to Mike Rikli, Defendant's branch general manager. (Docket Entry No. 32, at ¶ 7). According to Rikli, Plaintiff stated that he knew Abshire was joking and he did not want to take the matter any further. (Docket Entry No. 14, Rikli Deposition at p. 98). Plaintiff, however, asserts that he told Rikli that he was offended by the comment. Id., Plaintiff Deposition at pp. 113, 115, 141, 143. Rikli did not provide Plaintiff with the corporate office's telephone number to report the incident. Id. at p. 143. Rikli and Defendant's regional manager, Dan Jones, counseled Abshire about the "Achmed" comment. (Docket Entry No. 32, at ¶ 9). Abshire apologized to Plaintiff and did not make further comment about Plaintiff's national origin. Id. at ¶ 10.

According to Plaintiff, throughout his work with Defendant's managerial and non-managerial employees, Plaintiff was subjected to derogatory name-calling and comments based on his national origin. (Docket Entry No. 14, Plaintiff Deposition at pp. 70, 187). In addition to being called "Achmed," Plaintiff stated that he was also called "bin Laden," "terrorist," "Iraqi" and "Afghani" by other drivers in the presence of their supervisors and such comments "really kept [him] stressed out the whole time [he] was [employed]." Id. at pp. 70, 97-103. Plaintiff cited "Glenn Erickson," a district manager, as repeatedly making such comments. Id. at pp. 98-102. Danny Wilson, a driver,

called Plaintiff names based on his national origin, including one occasion before supervisors, Morgan and Haley. Id. at pp. 102-106. When Plaintiff complained to Morgan and Haley that "'[t]his is your job to put a stop to this,'" they only laughed at Plaintiff. Id. at p. 106.

On another occasion, Jeff Vanwye, a RSR driver, referred to Plaintiff as a "terrorist." Id. at pp. 107-08. Other employees were not present when this comment was made. Id. Rodney Barnett, another driver, called Plaintiff "bin Laden" regularly. Id. at pp. 109-111. On one occasion, Barnett did so in Rikli's presence. Id. at p. 111. When Plaintiff asked Rikli about responding to the comment, Rikli replied, "'I would open up a can of whoop-ass.'" Id. at pp. 111, 130-32. A mechanic, Jason, called Plaintiff "Iraqi" and "terrorist" sometimes in Morgan's presence without any corrective action. Id. at pp. 117-120. Plaintiff also identifies employees, Glenn Erickson,[3] Wilson and Vanwye, who made these comments, but Plaintiff did not report them or file a grievance. (Docket Entry No. 32, at ¶¶ 12, 14-1; Docket Entry No. 14, Plaintiff Deposition at pp. 102-03, 107-08, 133-35). Despite these comments, Plaintiff performed acceptably as an RSR without any disciplinary issues. (Docket Entry No. 57, Defendant's Response to Plaintiff's Statement of Undisputed Facts, at ¶ 17).

Plaintiff cites Defendant's "Employee Guidelines and Work Standards" during his employment, (Docket Entry No. 32, at ¶ 20), that provide, in part, as follows:

> Anyone who feels that he or she has been a victim of or has observed an act of harassment should immediately report such activity to the branch Human Resources Manager, General Manager or the Human Resources Director at the General Office.

---

[3]According to Defendant, the Nashville branch did not employ anyone named "Glen Ericson" during Plaintiff's employment, but did employ a district manager, Glen Wilkinson, who last worked for ALSCO on October 17, 2007. (Docket Entry No. 15, Regina Reich Declaration at ¶ 3). Defendant asserts that Wilkinson was an RSR, (Docket Entry No. 14, at 3), but Reich's declaration refers to Wilkinson as a district manager.

The Company will immediately investigate all such claims and take appropriate action. . . .

To report an incident, you may use the form provided in the back of this book, or report the incident in person or by phone. You may call the General Office collect at (801) 328-8831. . . . The Company can ensure a harassment-free workplace only if all employees report incidents of harassment quickly and accurately. Any supervisor or manager who has knowledge of any incident of harassment is required to report such information to the branch Human Resources Manager, General Manager or Human Resources Director.

(Docket Entry No. 56, Exhibit 2 at 0339).

Plaintiff did not discuss these comments with Gayle Robinson, Defendant's Nashville branch's human resources manager, nor did Plaintiff file a written complaint form. (Docket Entry No. 32, at ¶ 21). Plaintiff did not inform Regina Reich, Defendant's regional human resources manager, about any alleged comments by any specific employee except for Abshire's comment. (Docket Entry No. 14, Plaintiff's Deposition at pp. 127-30). Plaintiff stated:

Q. How many times did you speak with Miss Reich about comments that were made?

. . . .

A. . . . . It pretty much came up every time I met with her.

Q. Okay. What would you tell her?

A. Well, I just felt some of the things they were doing was racially motivated.

Q. What in particular did you share with Reggie?

A. You know, I shared with her about racial comments by Jackie. She was asking me questions about stealing because somebody called in on me, and I thought that was racially motivated also, and I made that clear to her.

Q. Did you mention to her comments made by anyone other than Jackie Abshire?

A. I don't recall that, no.

Q. Okay. So you're saying you don't recall discussing any comments that anyone made, other than Jackie?

A. Not to Reggie, no.

Id. at pp. 127-28.

During an October 8, 2008 meeting, Plaintiff did not tell Rikli about any alleged comments except Abshire's comment. Plaintiff stated:

Q. Did you have any other discussions with Mike Rikli, other than the time that you were standing outside smoking and Rodney made the comment to you?

A. About Rodney?

Q. About any comments that were made to you. Any other times you spoke with Mike Rikli?

A. Well, at the time I guess you could say things started blowing up was when I was being investigated and Mike Rikli felt that I was using that as an excuse.

Q. Using what as an excuse?

A. The racial comments and, you know, discrimination.

Q. Well, my question is, other than the time you were standing outside next to him and you heard Rodney Barnett call you bin Ladin, was there ever a time you specifically spoke with Mike Rikli about comments that were made to you?

A. We spoke so many times in the office about discrimination, I don't recall what exactly the exact words were about who.

Q. You just don't remember?

A. No, I don't remember. I know we've had conversations about them. I don't remember exactly what the conversations were.

Q. Did you ever have a discussion with Mike about things that Glenn Erickson had said to you?

A. No.

Q. Did you ever have a discussion with Mike Rikli about what Danny Wilson had said to you?

A. I didn't have any conversation about any specific person. I just told him that there were the comments were being made.

Q. Why didn't you give him a name? A specific person's name?

A. Well, because I felt at the time he heard it himself and he didn't do anything about it. Second, he was accusing me of using that as an excuse so he basically, didn't want to hear it. He didn't want to be bothered with it, didn't want to hear it. And once he made the comment to me about "This is the South, you got to expect discrimination," I knew what I was dealing with and I didn't want to deal with him.

* * * *

Q. . . . . My question, though, is you had discussion with Mike Rikli. You had the one time that he heard Rodney Barnett make the bin Ladin comment to you. There were several other conversations that you had with him that you discussed the work environment in general. Is that fair?

A. That's fair.

Q. Okay. And as I understand your testimony, you never specifically discussed with him what these six people had said to you, correct?

A. I don't remember any specific conversation about an individual. It was just an overall discussion about the name-calling by the drivers.

Q. Did Mike Rikli ever ask you, "Who's doing this? Hisham, tell me who's doing this"?

A. No.

Q. Never said anything to that effect?

A. No.

Q. Did you ever volunteer to him who was doing it?

A. I just said the drivers and Jackie did it.

9

Id. at pp. 132-34, 135. As a result of this meeting, on October 9, 2008, Rikli posted a memorandum to all branch employees to remind them that name-calling would not be tolerated. (Docket Entry No. 32, at ¶ 40).

On August 27, 2008, an anonymous person called Defendant's fraud hotline and reported that Plaintiff was overheard telling another RSR that he was taking cash for items he delivered, but not including the items on invoices. (Docket Entry No. 32, at ¶ 34). On August 29, 2008, Reich, interviewed Plaintiff concerning the anonymous complaint. Id. On October 31, 2008, Plaintiff met with Jones and Reich, who informed Plaintiff that he was cleared of any wrongdoing and that they were ending the theft investigation against him. Id. at ¶ 41.

On October 28, 2008, Rikli informed Plaintiff that "his attitude should change and he should do his job and keep his mouth shut." (Docket Entry No. 14, Rikli Deposition at p. 115). Rikli also stated that Plaintiff needed to stop the racial accusations and do his job. Id. Rikli further stated that if Plaintiff could not do his job without creating issues with his team, then he should work elsewhere. Id. at p. 116. Rikli explained that he was referring to Plaintiff's unfounded racial accusations. Id. at p. 117.

According to Abshire, a RSR position did not become available at any time between May 2008 and May 2009. (Docket Entry No. 16, Abshire Declaration, at ¶ 10). If a RSR position had been available after Plaintiff took the ASC position, Defendant would have been required to offer that position to Walter Staley based upon Staley's seniority. Id. Plaintiff, however, stated that some driver positions did become available, but Rikli told him that the positions would not be filled at the moment. (Docket Entry No. 14, Plaintiff Deposition at pp. 208-11).

On November 5, 2008, Plaintiff interviewed with Rikli, Robinson, and Abshire for a district manager position, a posted vacancy at the Nashville branch. (Docket Entry No. 32, at ¶¶ 35, 42). Another applicant, William Ray, Jr., interviewed for the position. Id. at ¶ 42. Defendant selected Ray who had more experience managing route service employees. Id. at ¶ 43. Ray worked six years as a route manager for a produce distribution company where he managed drivers. Id. Plaintiff's managerial experience included Coca-Cola that he left in 1997. Id.

In April 2009, Plaintiff's weekly sales average for the year was $16.59. Id. at 45. As an ASC, Plaintiff was responsible for generating $85.00 in weekly sales, but Plaintiff never met this goal. Id. at ¶ 44. On April 8, 2009, Defendant provided Plaintiff an "ASC Goal and Action Plan" to increase his sales number, with a warning that his failure to progress would result in his termination. Id. at ¶ 45.

On May 26, 2009, Plaintiff's weekly sales report for May 4, 2009, reflected $70.63 in new sales, but that figure included the products sold by other RSRs. Id. at ¶ 47. Plaintiff's weekly sales average increased his multiplier for future commissions and would impact his future pay. Id. at ¶ 48. Plaintiff disputes that he misrepresented the number of products sold, explaining that he reported the numbers as Rikli and Abshire instructed.

> Q. Would there ever have been a situation where you would have listed products or accounts sampled or products or accounts billed on invoice that you had not actually sold?
>
> A. Yes. Yes.
>
> Q. Okay. In what situations would you do that?
>
> A. When the drivers gave them to me. You know, like I say, when Jackie gave me all the ones that's been, you know, put out there for customers that's already not sampled but sold, I did put those down, but I didn't collect the money for them.

Q. Okay.

A. I didn't collect no commission on them.

Q. What was the purpose of putting it down on your activity report if you didn't collect a commission?

A. To bring my numbers up, according to Rikli, and with the help of Jackie.

Q. And who gave you authorization to do that?

A. Mike Rikli did.

Q. So there were times that you submitted this Weekly ASC Activity where you listed products that you actually had not sold as being your sales?

A. I listed it whether they were sold by me or the other drivers, but I did not collect any money for myself.

Q. How did you get information on what the drivers had sold?

A. Jackie gave it to me. . . . But like I said, once again, I never collected any money for them because that was the deal that I made with Rikli.

Q. Who knew that you were submitting sales–Weekly ASC Activity reports with driver sales listed on them?

A. Jackie Abshire, Mike Rikli, and all the drivers that I was working with. Like I said, at one point Jackie told the two drivers, you know, give Hisham the sales leads–or the numbers. But like said, once again, I would report the numbers to bring my numbers up, but they would get paid the commission on it, not me.

(Docket Entry No. 14, Plaintiff Deposition at pp. 215-16). Rikli denied that he or Abshire instructed Plaintiff to submit weekly ASC activity reports of driver sales. (Docket Entry No. 14, Rikli Deposition at pp. 133-34).

On May 29, 2009, Defendant terminated Plaintiff for failing to meet his sales goals and falsifying company documents. (Docket Entry No. 32, at ¶ 49). Morgan, who failed to meet his sales goals, was neither disciplined nor threatened with a loss of his job. (Docket Entry No. 57, at

¶ 25). Reich acknowledged that the majority of ASC's in the district do not make their sales quota. Id. at ¶ 34. Rikli stated that while Morgan did not meet the sales goal, Plaintiff's $18 week average at the time of his termination was far less than what Morgan averaged at any point. (Docket Entry No. 14, Rikli Deposition at pp. 129-30).[4] Rikli explained that Plaintiff's falsifying of company records was the primary reason for Plaintiff's termination as Rikli had not yet decided, if Plaintiff's weekly sales average could still be tolerated. Id. The ASC position at the Nashville branch has not been filled since Plaintiff's termination. (Docket Entry No. 32, at ¶ 50).

## II. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere

---

[4]Rikli stated that Morgan's weekly sales average was "somewhere in the neighborhood of $45 to $50." (Docket Entry No. 57, at ¶ 25). Defendant, however, did not provide a copy of the deposition excerpt in support, and the Court cannot consider this testimony.

existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

<u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex</u>, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But</u> <u>see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in <u>Celotex</u>:

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

14

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.

. . . .

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict</u> -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:
In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

16

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1.      Complex cases are not necessarily inappropriate for summary judgment.

2.      Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.      The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4.      This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.      A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement

17

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6.     As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9.     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.    The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

## A. HOSTILE WORK ENVIRONMENT CLAIM

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion sex or national origin." 42 U.S.C. § 2000e-2(a)(1).[5] A plaintiff can establish a violation of Title VII if he/she is able to prove that discrimination created a hostile work environment. Clark v. United Parcel Service, Inc., 400 F.3d 341, 347 (6th Cir. 2005). Title VII is thus violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citation omitted).

For a prima facie showing of hostile work environment based on national origin, a plaintiff must prove: (1) that he was a member of a protected class; (2) that he was subjected to unwelcomed harassment; (3) that the harassment was based on national origin; (4) that the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir.1999).

Harassment affects a "term, condition or privilege of employment" if the conduct is severe or pervasive enough to alter the conditions of the plaintiff's employment and creates an abusive working environment. Harris, 510 U.S. at 21-22. For conduct to qualify as having created a hostile work environment, both an objective and subjective test must be met:

---

[5]"THRA claims are analyzed in the same manner as Title VII claims." Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc., 173 F.3d 988, 993 (6th Cir. 1999) (citing Campbell v. Florida Steel Corp., 919 S.W.2d 26, 31 (Tenn.1996)).

"[M]ere utterance of an ... epithet which engenders offensive feelings in a [sic] employee," <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment– an environment that a reasonable person would find hostile or abusive– is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

<u>Id</u>. at 21-2.  To determine whether the objective and subjective tests are met, the Court must look at the totality of the circumstances.

[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance... no single factor is required.

<u>Id</u>. at 23.  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (citations omitted).

Defendant contends that Plaintiff cannot establish the fourth or fifth elements of his hostile work environment claim.  As to the fourth element, Plaintiff has presented evidence that he was subjected to name-calling based upon his national origin on numerous occasions throughout his employment with Defendant.  In his deposition, Plaintiff described these comments as offensive and causing him much stress.  In viewing the facts in the light most favorable to Plaintiff, as it must on a motion for summary judgment, the Court concludes Plaintiff has satisfied the fourth element of his <u>prima facie</u> showing.

For an employer to be vicariously liable for the harassment of its employees, the plaintiff must also show that the employer "knew or should have known of the charged... harassment and

failed to implement prompt and appropriate corrective action." Williams v. General Motors Corp., 187 F.3d 553, 561 (6th Cir. 1999) (citing Hafford, 183 F.3d at 513).

> As for the acts of co-workers, a plaintiff may hold an employer directly liable if she can show that the employer knew or should have known of the conduct, and that its response manifested indifference or unreasonableness. See Blankenship v. Parke Care Ctrs., Inc., 123 F.3d at 873 (citing Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 805 (6th Cir.1994)). Significantly, a court must judge the appropriateness of a response by the frequency and severity of the alleged harassment. See Erebia v. Chrysler Plastic Prods. Corp., 772 F.2d 1250, 1252-53 (6th Cir.1985). Generally, a response is adequate if it is reasonably calculated to end the harassment. See Intlekofer v. Turnage, 973 F.2d 773, 778 (9th Cir.1992) (citing Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983)).

Jackson v. Quanex Corp., 191 F.3d 647, 663 (6th Cir. 1999).

Plaintiff complained to Reich and Rikli about Abshire's comment. Plaintiff also complained to Rikli concerning other discriminatory name-calling, but did not specifically name any employee. On one occasion, Plaintiff stated that Barnett called Plaintiff "bin Laden" in Rikli's presence, but Rikli did not take any action. Rikli disputes that he witnessed Barnett's comment. Rikli also stated that Plaintiff did not name anyone other than Abshire as calling Plaintiff names based upon his national origin and Rikli posted a memorandum reminding employees that such name-calling would not be tolerated. Plaintiff, however, stated that Rikli told him to expect some discrimination in the South; to change his attitude; to keep his mouth shut; and to stop the racial accusations. If Plaintiff could not do his job without creating issues with his team, Rikli told Plaintiff that he should work elsewhere. According to Plaintiff, these comments exhibit Rikli's lack of interest in Plaintiff's complaints. Rikli, however, explained that he was referring to Plaintiff's unfounded racial accusations.

The Court concludes that a material factual dispute exists on whether Defendant's response to Plaintiff's claims was adequate or manifested indifference or lack of a reasonable response to racially discriminatory remarks. Lagunovich v. Findlay City Sch. Sys., 181 F. Supp.2d 753, 767-68 (N.D. Ohio 2001). Thus, Defendant's motion on his hostile work environment claim should be denied.

## B. DISCRIMINATION CLAIM

Under Title VII, an employer cannot discriminate against any individual with respect to the employee's compensation, terms, conditions or privileges of employment, because of such individual's national origin. 42 U.S.C. § 2000e-2(a)(1). "In a disparate treatment case, liability depends on whether the protected trait [here, national origin] actually motivated the employer's decision. . . . [A] disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

The language of Title VII "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment . . . ." Harris, 510 U.S. at 21 (citing Meritor, 477 U.S. at 64) (some internal quotation marks omitted).

> "A prima facie case of disparate treatment under Title VII must establish by a preponderance of the evidence that the defendant took action affecting the plaintiff's compensation, terms, conditions or privileges of employment under circumstances which give rise to an inference of unlawful discrimination. Thus, the prima facie case focuses upon the primary factual inquiries of any disparate treatment case: "'[whether] the defendant intentionally discriminated against the plaintiff'", and whether the employer treats people less favorably than others because of race, color, religion, sex or national origin.

Beaven v. Com. of Ky., 783 F.2d 672, 675 (6th Cir.1986) (citations omitted).

"[A] plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." Kline v. Tennessee Valley Authority, 128 F.3d 337, 348 (6th Cir.1997). Yet, "[t]he direct evidence and circumstantial evidence paths are mutually exclusive . . . . If a plaintiff can produce direct evidence of discrimination then the McDonnell Douglas-Burdine paradigm is of no consequence. Similarly, if a plaintiff attempts to prove its case using the McDonnell Douglas-Burdine paradigm, then the party is not required to introduce direct evidence of discrimination." Id. at 348-49. Here, Plaintiff relies upon circumstantial evidence to prove discrimination.

A plaintiff may create a presumption of discrimination when he establishes the following elements of his prima facie case by a preponderance of the evidence: (1) membership in a protected class; (2) that he suffered from an adverse employment action; (3) that he was qualified for the position; and (4) that he was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006).[6] To qualify as "similarly-situated," the employee to whom the comparison

[6]The Court notes that Plaintiff is not alleging a mixed- motive claim. See Spees v. James Marine, Inc., 617 F.3d 380, 390 (6th Cir. 2010) ("Plaintiffs must give proper notice when bringing mixed-motive claims.") (citing Hashem-Younes v. Danou Enters. Inc. 311 Fed. Appx. 777, 779 (6th Cir. 2009) (where the Sixth Circuit noted that the plaintiff presented her claims as single-motive claims pursuant to the general anti-discrimination provision of 42 U.S.C. § 2000e, the record was silent as to mixed motives, the plaintiff did not raise the claim in her complaint or mention it in her response to the defendants' motion for summary judgment); Bartlett v. Gates, No. 09-3823, 2010 WL 4723786, at *3 n.1 (6th Cir. Nov. 15, 2010) (plaintiffs failed to provide notice of mixed motive claims); Byers v. Midwest Terminal, Inc., No. 5:09-CV-00010-TBR, 2010 WL 3259734, at *4 n.2 (W.D. Ky. Aug. 17, 2010) (not a mixed-motive action where plaintiff did not raise issue in response and relied instead on indirect evidence of discrimination).

is drawn "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Hollins v. Atlantic Co., Inc., 188 F.3d 652, 659 (6th Cir. 1999) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992). If the Plaintiff establishes his prima facie case, the Defendant may offer any legitimate, non-discriminatory reason for the action, which Plaintiff may then rebut with evidence of pretext. Alexander v. Local 496, Laborers' Intern. Union of North America, 177 F.3d 394, 403 (6th Cir.1999) (citing Hartsel v. Keys, 87 F.3d 795, 800 (6th Cir.1996)). The burden at all times, remains with the Plaintiff. Id.

Plaintiff admits that he freely accepted the ASC position, and Rikli did not transfer Plaintiff against his will. Plaintiff was not similarly situated to Morgan as Plaintiff had a different regional manager who was, admittedly, less flexible about deviating from the company's SOP than the previous regional manager and eliminated Plaintiff's use of the van. The undisputed facts show that in April 2008, the Nashville branch had lost $70,000 in weekly revenue. Further, Jones, not Rikli, removed the benefit of allowing employees take the company van home. Thus, Plaintiff has failed to demonstrate that Defendant discriminated against him based on his national origin by assigning him to the ASC position, by paying him less and providing him with less benefits than similarly situated employees outside the protected class. Further, the undisputed facts reveal that after he left his job as a RSR, Plaintiff lost his union seniority and that neither Rikli nor Abshire had the authority

to override the union's seniority system. Plaintiff has failed to prove that he was treated differently than similarly-situated, non-protected employees who lacked seniority.[7]

Finally, Plaintiff has established a material factual dispute about his termination. Plaintiff was allegedly terminated for not meeting his sales goals and falsifying company documents. Defendant admits that Morgan was neither disciplined nor was his job threatened for failing to meet his sales goals, but states that Plaintiff's weekly sales average were far lower than what Morgan averaged at any point. Rikli also stated that Plaintiff's falsifying of company records was the primary reason for his termination. However, Plaintiff stated that he reported his sales as instructed by Rikli and Abshire. The Court concludes that this factual dispute is material and precludes an award of summary judgment.

## C. OUTRAGEOUS CONDUCT CLAIM

Under Tennessee law, to state a claim for outrageous conduct/infliction of emotional distress "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997) (citation omitted). "'It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.'" Medlin v. Allied Inv. Co., 217 Tenn. 469, 398 S.W.2d 270, 275 (1966) (quoting Restatement (Second) of Torts § 46(1) cmt. h). Tennessee courts recognize that "liability for mental distress damages clearly 'do[] not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities.'" Bain, 936

---

[7]Defendant also moved for summary judgment as to Plaintiff's application for the district manager position. However, Plaintiff did not address this claim in his response. To the extent that Plaintiff was asserting a failure to promote claim, the Court deems that claim abandoned.

S.W.2d at 622 (quoting <u>Medlin</u>, 398 S.W.2d at 274). Acknowledging that "no perfect legal standard

exists for determining whether particular conduct is so intolerable as to be tortious," the Tennessee

Supreme Court has adopted the "high threshold standard" of the Restatement (Second) of Torts that

states as follows:

> The cases thus far decided have found liability only where the defendant's conduct
> has been extreme and outrageous. It has not been enough that the defendant has acted
> with an intent which is tortious or even criminal, or that he has intended to inflict
> emotional distress, or even that his conduct has been characterized by 'malice,' or a
> degree of aggravation which would entitle the plaintiff to punitive damages for
> another tort. Liability has been found only where the conduct has been so outrageous
> in character, and so extreme in degree, as to go beyond all bounds of decency, and
> to be regarded as atrocious and utterly intolerable in a civilized community.
> Generally, the case is one in which the recitation of the facts to an average member
> of the community would arouse his resentment against the actor, and lead him to
> exclaim, 'Outrageous.'

<u>Id</u>. at 622-23 (quoting Restatement (Second) of Torts § 46 comment d (1965)); <u>see also</u> <u>Medlin</u>, 398

S.W.2d at 274.

"This is an extremely high standard for the plaintiff to meet." <u>Jenkins v. Nashville Public</u>

<u>Radio</u>, No. 3:02CV0179, 2005 WL 3358871, at *4 (M.D. Tenn. Dec. 9, 2005) (footnote omitted).

"[D]iscriminatory conduct does not automatically give rise to the imposition of liability for

intentional infliction of emotional distress. If it did, virtually every action brought under [the federal

Civil Rights Act and the THRA] would include an intentional infliction of emotional distress claim."

<u>Arnett v. Domino's Pizza I, L.L.C.</u>, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). Further, "'some

degree of transient and trivial emotional distress is a part of the price of living among people.' Thus

recovery for intentional infliction of emotional distress is limited to mental injury which is 'so severe

that no reasonable [person] would be expected to endure it.'" <u>Id</u>. (quoting <u>Miller v. Willbanks</u>, 8

S.W.3d 607, 615 n.4 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. j (1965)).

Usually, Title VII claims require less proof than state law claims for outrageous conduct or intentional infliction of emotional distress. See Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 688 (10th Cir. 2007) (citing David C. Yamada, The Phenomenon of "Workplace Bullying" and the Need for Status-Blind Hostile Work Environment Protection, 88 Geo. L.J. 475, 503 (2000)). For his outrageous conduct claim, Plaintiff does not present any other facts apart from his discrimination claims. "Alleging a violation of anti-discrimination laws, without additional evidence showing conduct so outrageous as not to be tolerated in civilized society, is simply insufficient to prove intentional infliction of emotional distress." Jenkins, 2005 WL 3358871, at *4. While Plaintiff was exposed to comments based upon his national origin and was later terminated, the record reveals that Rikli did take some corrective action and there is not evidence of any physical touching or hostile threats in conjunction with the name-calling. Accordingly, the Court concludes that Plaintiff's state law outrageous conduct claim should be dismissed for failing to meet the standards of Tennessee law.

As to Plaintiff's punitive damages claim under Title VII, "[a] complaining party may recover punitive damages . . . if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). As Plaintiff has established an issue of fact that Defendant engaged in discriminatory conduct, the Court concludes that a reasonable jury could conclude that Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights. Thus, Defendant's contention that it did not engage in any conduct that would entitle Plaintiff to punitive damages under Title VII fails.

Accordingly, for these reasons the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 12) should be granted in part and denied in part consistent with this opinion.

An appropriate Order is filed herewith.

**ENTERED** this the 3nd day of June, 2011.

_____
WILLIAM J. HAYNES, JR.
United States District Judge